Our third case this morning is United States v. Stochel. May it please the court, counsel for the government, Brian Woodward for the defendant, appellant Robert Stochel. Mr. Stochel appeals his criminal conviction pursuant to an indictment and a conviction on one count under the federal mail fraud statute and a subsequent sentencing. He seeks reversal of his criminal conviction, and in the event that his conviction is not reversed, at least a remand for resentencing. In United States v. Bach, the Seventh Circuit recognized that there exists a great tension between lulling, as it's been coined under the federal mail fraud statute, and avoidance of detection. The milling at issue here is a trial rule 60B motion seeking relief from judgment from an order of the court of which Mr. Stochel had no notice. It is the position of Mr. Stochel that this trial rule 60B motion is avoidance at the most. Now, in order to adequately address this question, I think we have to just briefly summarize, once again, the elements of mail fraud. Those are a scheme to defraud, the intent to defraud, and the use of the mails in furtherance of that fraud. So ultimately, the question that comes to bear in this case, in every case, is what was the scheme? In this place, in this case, rather, the scheme, so-called scheme, started in 2001. Mr. Stochel was appointed receiver over a receivership as a result of two brothers who were at odds over how the corporations of which they were members should be handled. Receivership was appointed through the Superior Court of Lake County. Mr. Stochel was the successor receiver, and beginning in 2001, he made some unauthorized withdrawals. Those withdrawals proceeded until 2004, at which time the receivership bank account had basically been drained to zero. The method by which he would do this, he would draw a check on the receivership account, negotiate the check. It would pass through the banking channels, and he would retain the funds. And then at the end of every month, as with virtually every bank account, a statement would come from the bank showing these unauthorized withdrawals. At that juncture, the scheme, in essence, was complete because, in the words- Not as alleged in the indictment. The scheme carries on, at least if you look at the paragraph 8 of the indictment. That is the scheme as alleged in the indictment. That is true. But in order for the scheme to go on and to focus on the mailing in question, that is Tri-Rule 60B, Motion for Relief from Judgment, we have to apply some of the basic principles of what the mailing must entail. That is, we know that the mailing must be an integral part of the scheme's execution. We know that the scheme's success must depend upon the mailing. We know that the mailing must be sufficiently closely related to the scheme or, not since the Schmuck case, the use of the mails need not be an essential element of the scheme after the Supreme Court decided Schmuck. Schmuck says it has to be incident to an essential part or a step in the plot. We also know that mailings that work against the scheme are insufficient to support the mailing requirement. So, the relevant... His motion basically was an effort to postpone the Day of Reckoning, the disclosure of his theft from the receivership, because it kept the state court in the dark, it kept the beneficiaries in the dark, it kept everybody in the dark except for him, and he was doing that or so a rational jury could conclude to cover up his fraud. It actually did just the opposite. What this motion did was it hastened the Day of Reckoning, because we have to remember, in order to lull, because that's the theory and that was how the jury was instructed... The judge and the other parties is sort of beside the point. The question is whether it was part of the scheme, the ongoing scheme, to continue to cover up what he had done early on in the receivership. True, he didn't steal more later, but he was trying to avoid the exposure of his theft. And I think avoid is the key word in that sentence, Your Honor. That is avoidance of detection. There comes a point where the scheme is necessarily complete, and anything after that is merely avoidance of detection. Because you have to remember, at the juncture that this had happened, for lack of a better term, the hounds had been loosed at this point. He was ordered by a court order of which he had no notice to turn over the files and to pay the auditor. He learned of this court order. Well, the motion was filed without notice. The order was issued. He learned of the order the same day, or I believe it was the same day, that his compliance was necessarily required. He made a false statement in that motion. He said the receivership account had adequate funds to make an $8,000 retainer payment. The fund had been closed two years earlier. So it's not just a, I didn't get notice. It's, I didn't get notice, and here's a lie that I'm going to tell you to buy another month of not getting caught. The actual statement, I think, was the receiver has adequate funds to make the payment when required. However, whether it's false or whether it's true, we know that doesn't matter either. That's irrelevant to the equation because even a true statement can serve as a basis for mail fraud. Fair that out. Can I ask you? Oh, go ahead. I think that just begs the question. Is it lawing or avoidance of detection? And go ahead. I'd like to ask you a question about your offsets for purposes of sentencing. Correct. The amounts are kind of all over the map, it seems to me. So what exactly is the amount that you think should have been the accurate amount at sentencing? I've spent some time trying to be a forensic accountant myself to figure out what the intended loss and what the actual loss is. Tell me what is your position exactly? The loss setting aside any entitlement to a deduction for attorney fees earned later in this court. Set that aside. I'm just talking about money he repaid. Or paid into the fund. $220,000 some odd dollars. And you get to that figure by, there's an exhibit, I think it's exhibit... 100A? Yeah, 100A. No, 100A I think is the total unauthorized withdrawals. But it's in the 100 series right after that on page 75, 76, 77 of the appendix. And the forensic accountant for the government listed all the legitimate receipts that the receivership should have received. And there's a separate in that same series in the appendix showing $307,000 of repayments. And so the total receipts of the receivership should have been roughly $528,000. The total payments back to the receivership were about $307,000. And if you net those out, you get back to $220,000. Now that puts him at a level 10 instead of a level 12 under the sentencing guidelines. So it's a two-level bump, it's an increment. And then if you consider the fees earned and then later disgorged, that's another $95,000 bump, which would take him down to a level 8 instead of the level 12 that the pre-sentence report calculated and the court adopted. That's how you would get to the actual loss. Now, that's not the government's position. They say look at intended loss, and there are some problems with their argument as to intended loss because if you look at the application note to 2B1.1, 3E1 I think it is, if you look at that application note, there are certain parameters you look at. That is, had the defendant been found out yet? If he's detected and you pay back the money, then you don't get credit for those repayments. I think Philpott is a Seventh Circuit case where the lawyer for the county commissioner had told Mr. Philpott, hey, you've got to pay the money back. He paid it back, he sought credit for that. They said, no, you don't get that. So either if it's been detected or it's about to be detected, you don't get credit for those payments back. But these payments were all made before the hounds were loosed. These payments were made between 2004 and 2006. And you have to remember, this indictment was returned in 2015. The mailing in question took place in March of 2012. So it's either six or eight years later that the mailing that the government relies upon occurred, and nine years or 11 years, depending on which cutoff date you want to use, before the indictment was returned. Certainly he was entitled to that $307,000 that he paid back into the account. And pointedly, the government wants to argue that these were to pay certain expenses that the receivership estate was incurring. And yes, they were. But if you look at the amounts in the exhibit, they greatly exceeded the ongoing expenses of the receivership. There was a $100,000 payment, I think a $200,000 repayment. They were large sums deposited back into the account long before anyone even had a whiff what was going on. And they were used to pay the legitimate expenses of the receivership account? In other words, he didn't put them in and then take it back out of the cookie jar? For payment of expenses. Right. So what I'm saying is they were true repayment, not he put it in and then took it back out for his own personal use. Well, there are some times that that occurred. Granted. But if you take the account down to zero, whether you start at $100,000, $200,000, half a million dollars, it doesn't matter. If you take it down to zero and you put in $50,000 and then you take it out again, that's not additional loss or intended loss. That's just taking the money back out that you took initially, repaid, and took back out again. You don't get the credit for that, right? I mean, if you put $50,000 in and then you take it back out, you don't get a credit or an offset for that under any scenario, right? No, but he would certainly, at the very least, get credit for the $220,000 that should have been there that he took out and repaid, and then the legitimate expenses. So the only accurate and permissible way to do the math is, because we don't meet the application note, is what should have been there, what did he repay, what's the difference? When he repaid it, though, it was because there was an expense, which if left unpaid, would have blown up the scheme. Is that correct? That is true, but that's not the standard. That's not what we look at. We look at had he been detected under the application note. Had it been detected? No, we know it wasn't because it wasn't detected until the audit was performed late in 2012. We're talking about repayments in 2004 through 2006. Nor is the standard, I'm going to repay this so they don't start looking around. That confuses lawing behavior with what the application note requires. So under the application note, the 2B1.1, he's certainly entitled to those repayments that he made. If I could, just for a second, get back to the lawing on the conviction itself. Lawing, as defined by this Court in the Supreme Court, has to create a false sense of security. It has to postpone complaints to the authorities. Now, the complaints were already made. The investigation was underway. The auditor was appointed, and by the way, there's no requirement that an auditor be appointed on receivership in the State of Indiana. This was something requested by the parties. Indeed, as one of the cases note, it would have been the preference of Mr. Stoschel that no audit had ever been performed. Now, if we were talking about the final accounting that was filed more than five years before the indictment, I would have a hard time standing here saying that doesn't constitute lawing under the federal mail fraud statute. But this is something after the fact, after he was found out. There was nothing that he could do at that point to make apprehension less likely. There was nothing he could do that would permit this so-called scheme to defraud, which was over years before, to continue. He could have refrained from lying to the court about sufficient funds. He could have, but lying to avoid detection doesn't constitute mail fraud. Lying to buy another period of time, 30 days, 60 days, whatever it was, is lulling behavior. It's certainly an attempt to lull the court and the other parties to the receivership that there are sufficient funds when, in fact, there are not. I see it, Your Honor, as once you're on the hook and everyone knows you're on the hook, anything you do from that point forward. Otherwise, there's no end. I see my time is up. Thank you. Mr. Whelan. May it please the court. Good morning, Your Honors. Nathaniel Whelan here on behalf of the United States. I think Your Honors understand the nature of the scheme to defraud here, but I just want to quickly hammer home the point. This isn't avoidance. I don't really understand the difference, actually, between avoidance and lulling as it's being used. As Judge Jerkin pointed out, the indictment alleges Mr. Stoeschel stole the money. As of 2004, the account is bare. He then spends the next eight years, rather successfully, telling everyone, don't look at the account. There's nothing to see here. Trying to convince the victims of this case that, in fact, there is still money. They don't have to appoint the auditor because, as he says in his deposition, he knows when they start digging into those records, they're going to figure out exactly what went on and that he stole the money. That is lulling, as this court has put it in all the cases cited in a brief, as the Supreme Court describes it, and Samson. It is to put the victims at ease and say, you don't need to follow up on what I've been doing. Yes, I've been appointed to protect this money. You can trust me. There's plenty of money here. They're all acts of concealment or attempts to conceal the fraud, which is an integral part of the fraud. That's exactly right, Your Honor. It's eight years of successful attempts. I don't know that there's – the Supreme Court in Schmuck rejected the notion, I think, that there's – if this mailing is going to make detection more likely, it doesn't constitute mail fraud. But I also think factually this mailing didn't make it more likely. It's, again, Mr. Stoschel trying to say, nothing to see here, guys. Don't need to appoint the auditor. I'm not going to hand over my files right away. And then he gets another three months out of it. He – after he files the Rule 60 motion, he has another three months before he actually has to comply with the court's order. Can I – I was about to say, unless there are any questions about the conviction. I was going to say, I'd like to talk about the credits. I would love to talk about the credits, Your Honor. I believe the $220,000 that Mr. Stoschel was talking about is Exhibit 100L. And, Your Honor, we did bring in a forensic accountant who did the best she could. So in 100L, it talks about what she believes should have been available for distribution based on Mr. Stoschel's representations. And that's page 79 of the first appendix. But on page 75, which is Exhibit 100F, there's that $307,000 amount that Mr. Stoschel represented – or talked about in his opening argument. And I think Your Honor is exactly right, Judge Barrett. On page 5 of our brief, we lay out how this money was spent. And so you have this first roughly $100,000 that's put in between when the account goes bare and February of 2005. He almost immediately pulls that back out. So he's putting it in, takes it back out. And what he says in his deposition is the reason he's doing that is because he wants to keep the account open. Starting in February of 2005, there's this mediation between the parties, and they agree that they're going to disperse all the funds. They want to settle this dispute that's been raging on for 18 years at that point. So they want to have a $75,000 payment come out of the receivership. Now, the account is bare. It's been bare for a year now. There's about $280 at that point. So what Mr. Stoschel does, and if you look at Exhibit 100F, it's reflected on the February 23, 2005 transaction. He puts in $100,000. He then immediately deposits or withdraws $75,000 pursuant to that mediation. A couple days after that, he withdraws another $18,000 of a legitimate receivership account. There is no $200,000 deposit. What he's doing is he's putting in just enough money, as Judge Durkan noted, to cover these legitimate receivership expenses. So here's the question. If he's putting in enough money to cover the legitimate receivership expenses, under the application note, I'm just wondering why he shouldn't get a credit for that, because I don't read the cases that you cite for that proposition as standing quite for that result, and the application note does distinguish between payments made before and after discovery, and your interpretation would extend beyond that application note. I mean, you can read the application note as saying you get credit until the scheme is discovered, and then after that, if you're trying to put money back in to lower your guidelines range, you're not going to get credit for it. That's not what he did here. So is the only reason why he didn't get credit this theory that you have about, listen, if you're putting the money in to avoid detection, you shouldn't get the credit? Is that the reason, or is the reason that, as you're kind of saying now, he didn't really repay much money because he was taking it all back out? Well, there are two different theories we put forward in our brief. The first is the position this court adopted in Pew, the case that was eventually overturned, that says when you're making payments to continue the lulling, you don't get credit for that. And the reason Mr. Stoschel is putting all this money into the account to make these receivership payments is because these payments need to come from the receivership account. So they need to have the receivership check. It needs to look like there's money in the receivership account so that no one comes and looks and tries to dig in to figure out, wait a minute, why isn't any of this coming from the receivership account? That's what he's doing, and that's why he doesn't get credit for that. But alternatively, this court could base it on the district court's finding that in February of 2005, he reasonably should have known the scheme was about to be uncovered. Not that it was uncovered. It certainly wasn't uncovered at that point. But that's the time when there's this mediation, and there's less than $300 left in the accounts. He knows that if he doesn't start putting these payments in, that he is not – that someone's going to figure out, you know, the cookie jar is bare, essentially. And so he reasonably should have known at that point that people were about to uncover the fraud. And at that point, if we take that point, that February 2005, as a relevant day, would there be any credits for money that he, quote, repaid or put back in the account before that? Or does that just knock out part of what he wants? Well, Your Honor, that's going to knock out the vast majority of it. But he also doesn't get credit for the payments before that because that's the money he's putting in and taking out right away. So it's not like he's actually repaying anyone at that point. He's just putting it in to keep, as he says in his deposition, to keep the account open so that the bank doesn't close the account. It's a functional Ponzi scheme. That's absolutely right, Your Honor. Because that money wasn't used to pay the legitimate receivership expenses. None of that money was used to pay the legitimate receivership expenses, and that's all before February of 2005, Your Honor. So I think if you look at Exhibit 100-F and compare that with 100-I, 100-F are the withdrawals, let me make sure I can get that right, deposits, unrelated to the receivership. And 100-I are the withdraws, unrelated to the receivership. And if you kind of play the role of forensic accountant, unfortunately, and jump from exhibit to exhibit, you can see what's going on, where he's just putting it in, taking it out almost immediately up through 2005. And then after that, he's just putting in enough to cover all the expenses after that. So if he were to get any credit, it would really only be for the things after 2005, when some of the money he was putting in maybe went towards legitimate receivership expenses, as opposed to what Judge Sykes has called the Ponzi scheme. Well, it's our position that he shouldn't get any credit for that, Your Honor. I know, I know. But yes, if he were to get any credit, that would be the credit that he would get. But keep in mind, we're also talking about intended loss here, which is what the district court based this on, and not actual loss. You certainly are entitled to credit for intended loss, and I'm not trying to argue that. But that's why there's a discrepancy between the $220,000 that Mr. Stoschel thinks that should be the loss amount. That's the actual loss. But what the district court found is the intended loss was roughly $330,000, which is the most the account has before it's drained bare. Because Mr. Stoschel intended to steal every single cent that he could. But wouldn't he still be entitled to credits against the intended loss? He would, Your Honor. But I just want to explain where the $330,000 comes from. Yeah, this court's determined that you do get credit for intended loss. Okay, so explain to me why that application note, which draws this line, let's put aside the district court finding that he was on the cusp of discovery and should have known that in February of 2005. Why doesn't this application note, which draws a line between payments made after discovery or on the cusp of discovery and what you're calling kind of lulling payments, say, why should we say that the lulling payments don't count, given that the application note draws a different line? Well, Your Honor, I think this court has already said that the lulling payments don't count. Well, Zark Pugh, I think, makes it pretty clear that any payments in furtherance of the fraud don't constitute any credit against loss. These payments are all in furtherance of the fraud because he's trying to avoid detection. But that's not an interpretation of the application note. That's an interpretation of intended loss because he doesn't intend these victims to get any of their money back by paying these receivership expenses. What he's intending is he's intending to make sure no one realizes there's no money left. This court's talked a little bit about how basically the credit against loss should reward someone who's maybe had a change of heart or who's realized that what they've done is wrong, and their intentions change. So I no longer intend to steal every cent. I've changed my mind, and I've decided, yeah, I want you to get some of the money back. That's my intention. There's no evidence of that intention in this case. Well, on the bottom line, it's the defense burden to prove entitlement to the offsets. That's correct, Your Honor. And we review only for clear error the district court's rejection of these offsets, and he hasn't proved that these were legitimate expenses rather than a part of the fraudulent scheme. That's correct, Your Honor. And just quickly touching to the $93,000 fees, this is an all-or-nothing proposition, as Mr. Stoshels put it. He's entitled to all $93,000 or nothing, as the district court founds. It's a little galling that Mr. Stoshels is taking the position that he should get credit for work that he did in stealing from these victims. He billed for the times that he prepared these fraudulent statements. He billed for the times that he's lulling the attorneys into believing that there's money into the account, and he wants credit for that. There's no basis in the record for that, and the state court appropriately withdrew those fees. At the same time, it kicks Mr. Stoshels off the receivership. At the same time, it says you need to comply with my order. Right. So why should a federal court countermand that determination by the state court? We absolutely agree with that, Your Honor. And it certainly wasn't clear error for the district court to accept the state court's finding. None of these were legitimate expenses? Mr. Stoshels hasn't pointed to any that were legitimate expenses, and the state court didn't find. The state court didn't parse that $93,000 and say, well, some of these were legitimate. The state court said. Zero. Yeah, zero. I think the state court was beginning to understand what was going on at that point. Your Honors, I'd be happy to discuss the acceptance of loss or the prior judicial order if this court has any questions. Otherwise, I think we would rest on our briefs on those two points and ask that you affirm the conviction and sentence. Thank you. Thank you very much. Mr. Woodward. About 30 seconds left, I believe, Your Honor. If you look at the appendix, page 76, it's Exhibit 100D. It sets forth the legitimate expenses, the repayments from other than receipts from the receivership, and it clearly shows, and this is the government's forensic accountant that prepared this document, not the plaintiff. Or, I'm sorry, the defendant. It shows deposits other than 2004 and 2005 totaling $305,000. It shows legitimate expenses in 2005 of $209,682. Those were clearly payments made to cover receivership expenses before anyone was any the wiser as to what was going on. Just a word about Pew. Pew was based upon interest payments made on a bank note to which several people had access to the banking records and the banking statements. It's important to remember that Mr. Stoschel was the only signatory to this account. He's the only one that had access to the account, nor the beneficiary, the court. No one had access to these records that would have discovered these withdrawals nor the repayments. That's why he's entitled to credit for those payments made. Thank you, Your Honor. Thank you. The case is taken under advisement. Our thanks to both counsel.